UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA, CIVIL NO. 01-1786 (DSD/JMM)

Petitioner,

v. REPORT AND RECOMMENDATION

JOHN LEONARD DAVIS,

Respondent.

The above matter came on for hearing before the undersigned on January 25, 2002 upon the Government's Petition to Determine the Present Mental Condition of an Imprisoned Person Due for Release Under 18 U.S.C. § 4246 [Docket No. 1]. The hearing was held at the Federal Medical Center in Rochester, Minnesota. Joan Humes, Assistant U.S. Attorney, appeared on behalf of Petitioner; Katherine Menendez, Assistant Federal Public Defender, appeared on behalf of Respondent. The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

**FINDINGS OF FACT/REPORT**

**Procedural History**

Respondent was arrested in California as he left Mexico. Agents found 36.22 kilograms of marijuana hidden in his car (more than 79 pounds). He was convicted of importation of marijuana, and possession of marijuana with intent to distribute. His Presentence Report shows (among other things) that he has used 14 names in addition to his own, two birthdates in addition to his own, and two Social Security numbers in addition to his own. Government Exhibit 3. ("GX3") He was sentenced in 1999 to a term

MAR 1 2 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

of 21 months of imprisonment. On May 8, 2000, Respondent was released from prison upon conditions. He violated many of those conditions,[1] so on April 16, 2001, the Court revoked Respondent's supervised release, and sentenced him to custody for seven months, which would have expired on October 2, 2001. He was initially assigned to Federal Correctional Institution (FCI) Victorville, California, arriving May 11, 2001. Soon thereafter, he was referred to FMC Rochester, "due to his deteriorating psychiatric status."

Respondent arrived at FMC Rochester on July 10, 2001, and was admitted to the inpatient psychiatric treatment unit. It appears that Respondent consented to such treatment. "Upon admission, the patient displayed prominent persecutory delusions that numerous members of his family had been killed by gangs. He acknowledged auditory hallucinations. He also exhibited grandiose delusions, stating he was a medical doctor and had been appointed by the government as a CIA agent." He got into fights and arguments. He was lodged from time to time in the Special Housing Unit (SHU) which is used for prisoners who present a risk of danger to themselves or others.

On September 25, 2001, FMC Rochester completed its Risk Assessment Report (GX2). For the reasons summarized in their eight-page Report, staff recommended that a Petition be filed seeking commitment of Respondent pursuant to the provisions of 18 U.S.C. § 4246. The Petition was filed two days later [Docket No. 1]. By Order dated October 4, 2001, a prompt hearing was ordered [Docket No. 3]. At the request of Respondent, (e.g. the Motion for Continuance, Docket No. 5), the hearing was postponed

---

[1] Among other things, he tested positive for the use of cocaine, he did not take his prescribed medication, and moved without notifying his probation officer. Within one week after being referred for treatment, he was terminated by that facility.

to January 25, 2002.[2] The Government called two witnesses: Dr. Christine Scronce, Director of Forensics at FMC Rochester; and Ms. Emily J. Young, a Social Worker at FMC Rochester. Respondent testified, and he called Dr. Susan Pearlson as a witness. The Court received Government Exhibits 1 - 4 and 6 - 8, and Respondent's Exhibits 1 - 9 and 10 - 18. The Parties were allowed to submit post-hearing Memoranda, the last of which was received on February 8, 2002.

**Applicable Law**

Congress has enacted comprehensive laws setting forth the principles to be applied, and the procedures to be followed in circumstances where a defendant is alleged to suffer from mental illness. 18 U.S.C. §§ 4241 through 4247: Sections 4241 through 4244 apply to circumstances where the question of mental illness and need for treatment precedes sentencing; Section 4245 applies where the defendant has already been sentenced to prison, and it is believed that he has a mental disease or defect which requires hospitalization for treatment; Section 4246 describes the process to be followed where the Government concludes that a prisoner is due for release, but he is suffering from a mental disease which would create risks of safety if he is not detained and hospitalized for treatment; Section 4247 contains general provisions applicable in all cases.

---

[2] Although the statute expressly contemplates a "stay [of] the release of the person pending completion of the procedures contained in this section," it is the responsibility of the Government to seek relief in sufficient time prior to the expiration of the term of commitment to avoid a circumstance where the processes themselves would be used improperly to detain a prisoner beyond his release date. In this case, Respondent concluded that additional time for treatment and preparation for the hearing was desirable, and it was hoped that a placement with a State facility might be possible, thus waiving concerns which otherwise might be addressed by the Court.

In an earlier opinion of this Court, we set forth the legal principles to be applied in the consideration of a Petition of the Government under 18 U.S.C. § 4246. In U.S. v. Chairse, 18 F. Supp.2d 1021 (D. Minn. 1998) we stated:

> "Section 4246 provides for the indefinite hospitalization of a person who is due for release but who, as the result of a mental illness, poses a significant danger to the general public." United States v. S.A., 129 F.3d 995, 998 (8th Cir. 1997) (citing United States v. Steil, 916 F.2d 485, 487 (8th Cir. 1991)). The provisions of 18 U.S.C. 4246 have withstood various constitutional attacks. See United States v. Sahhar, 56 F.3d 1026 (9th Cir.), cert. denied, 516 U.S. 952 (1995); United States v. Sahhar, 917 F.2d 1197 (9th Cir. 1990).
>
> Proceedings under 18 U.S.C. § 4246 are commenced when the director of a facility in which a person is hospitalized files a certificate with the clerk of court certifying that a person whose sentence is about to expire: (1) is "presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another" and (2) "suitable arrangements for State custody and care of the person are not available." 18 U.S.C. § 4246(a)[3]; accord S.A., 129 F.3d at 998; Sahhar, 917 F.2d at 1200 (quoting

---

[3] 18 U.S.C. § 4246(a) provides in relevant part:

> "If the director of a facility in which a person is hospitalized certifies that a person whose sentence is about to expire, . . . is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, and that suitable arrangements for State custody and care of the person are not available, he shall transmit the certificate to the clerk of the court for the district in which the person is confined. . . The court shall order a hearing to determine whether the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or

18 U.S.C. § 4246(a)). After the filing of the certificate, the court holds a hearing guided by the requirements of 18 U.S.C. § 4246(d). S.A., 129 F.3d at 998; accord Sahhar, 917 F.2d at 1200. "[T]he purpose of the certificate is to stay the defendant's release pending completion of the procedures contained in section 4246." United States v. Wheeler, 744 F. Supp. 633, 636 (E.D. Pa. 1990).

If the requirements of 18 U.S.C. § 4246(d) are met, the hospitalized person will remain in the custody of the United States even after the expiration of his or her sentence. That section provides in full:

> "If, after the hearing, the court finds by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, the court shall commit the person to the custody of the Attorney General. The Attorney General shall release the person to the appropriate official of the State in which the person is domiciled or was tried if such State will assume responsibility for his custody, care, and treatment. The Attorney General shall make all reasonable efforts to cause such a State to assume such responsibility. If, notwithstanding such efforts, neither such State will assume such responsibility, the Attorney General shall hospitalize the person for treatment in a suitable facility, until-
>
> (1) such a State will assume such responsibility; or
>
> (2) the person's mental condition is such that his release, or his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would not create a substantial risk of bodily injury to another person or serious damage to property of another; whichever is earlier. The Attorney General shall continue periodically to exert all reasonable efforts to cause such a State to assume such responsibility for the person's custody, care, and treatment."

---

serious damage to property of another. A certificate filed under this subsection shall stay the release of the person pending completion of the procedures contained in this section."

18 U.S.C. § 4246(d).

In sum, the requirements of 18 U.S.C. § 4246 mandate that the Government show the following factors: "(1) mental disease or defect; (2) dangerousness if released; and (3) no suitable state placement." United States v. Ecker, 30 F.3d 966, 970 (8th Cir.), cert. denied, 513 U.S. 1064 (1994); S.A., 129 F.3d at 1000.

The Court recognizes that it is entrusted with "'an awesome responsibility to the public to ensure that a clinical patient's release is safe.'" S.A., 129 F.3d at 1000 (quoting United States v. Bilyk, 949 F.2d 259, 261 (8th Cir. 1991)). We are also guided by the fact that the statute imposes a high standard of proof on the Government. It must prove that the Respondent will pose a "substantial" risk to society if released, and it must present "clear and convincing evidence" to support that conclusion.

It is appropriate to add to this recitation the reminder of the Court of Appeals for the Eighth Circuit in United States v. Steil, 916 F.2d 485 at 488 (8th Cir. 1990):

> "It has to be recalled that the government's role here is not that of punitive custodian of a fully competent inmate, but benign custodian of one legally committed to it for medical care and treatment--specifically for psychiatric treatment."

It is also important to keep in mind the provisions of 18 U.S.C. § 4247(h), which permits a person who is hospitalized (or his counsel) to challenge his continued hospitalization by filing a motion for a hearing to determine whether he should be discharged. This motion may be filed at any time, but it may not be filed within six months of a judicial determination that he should remain hospitalized. Discharge at the instance of the Government may be achieved at any time, by following the procedures of 18 U.S.C. § 4246(e).

## Issues for Consideration

There is not disagreement between the Parties as to the fact that Respondent suffers from a mental disease or defect, specifically Schizo-Affective Disorder of the Bipolar type, Polysubstance Dependence and Antisocial Personality Disorder. The reasons for this conclusion are in large measure summarized in the Risk Assessment Report (GX2), and were elaborated upon in the testimony of Dr. Christine Scronce. Dr. Susan Pearlson, called on behalf of Respondent, agrees that Respondent suffers from a major mental illness.[5]

Respondent makes essentially two arguments in opposition to the Petition. One of the arguments is that "the United States has failed to meet its burden of proof that Mr. Davis' release would pose a substantial risk of bodily injury or serious damage to property." This argument appears to be contradicted by Dr. Susan Pearlson, the expert who testified on behalf of Respondent, who expressed this conclusion in her Report:

> "It is highly probable that Mr. Davis will discontinue oral medication, return to substance use and engage in illegal behavior upon release from prison."

DX15, p. 8.

The other argument of Respondent is that "the United States has failed to prove the necessary causal link between Mr. Davis' mental illness and the possibility of

---

5

Dr. Pearlson's report states: "Mr. Davis described a history and has demonstrated symptoms consistent with the major mental illness, Schizoaffective Disorder, Bipolar Type. He has experienced periods of illness during which there have been manic and Depressive episodes concurrent with delusions (false beliefs) and hallucinations (false perceptions). . . . Due to his long history of inconsistent medication compliance his stability would be better assured with the use of an injected form of antipsychotic medication." Defendant's Exhibit 15, p. 7.

future bodily injury to individuals or substantial danger to property." This is apparently based at least in part upon the next sentence of the report of Dr. Pearlson which expresses the following qualification:

> "However, it is my opinion to a reasonable degree of medical certainty that there is not clear and convincing evidence that Mr. Davis is suffering from a mental disease or defect *which would create* a substantial risk of bodily injury to another person or serious damage to the property of another should he be released."

DX15, p. 8 (emphasis in *italics* supplied). Unfortunately, the evidence did not establish a basis for this conclusion.[6] We consider each of Respondent's arguments below.

## I. RELEASE OF RESPONDENT WOULD CREATE SUBSTANTIAL RISKS OF INJURY, OR OF DAMAGE TO PROPERTY.

Having in mind the first quoted conclusion of Dr. Pearlson, we may start our analysis with the undisputed fact that if Respondent is released, he will not take his prescribed medication, he will abuse substances, and he will engage in illegal behavior. There is clear and convincing evidence that the release of such a person will create a substantial risk that other persons will be injured, and that serious damage will be done to their property. Some of that evidence comes from the report of Dr. Pearlson.

---

6

Although the point was not argued by Petitioner, we are also skeptical that Dr. Pearlson's opinion as to the sufficiency of the evidence is truly a medical opinion. See Nelson v. Sullivan, 946 F.2d 1314, 1316-1317 (8th Cir. 1991)("Medical testimony is relevant in determining precisely what claimant's physical impediments are, but it is not conclusive as to the ultimate question concerning whether the claimant's injuries are so severe that he is prevented from doing productive work. See *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (physician's testimony on medical condition impacts only one aspect of disability equation); *Garrison v. Heckler*, 765 F.2d 710, 713 (7th Cir. 1985) (physician's testimony that claimant is disabled is not a medical opinion).")

Respondent argues in his Memorandum that the evidence of this risk is not substantial. He argues that there are few indications of actual violence by Respondent while released, and that the occurrences in 1995, 1998 and 1998 are not sufficiently recent, and the threats of violence were not actually carried out. As to the acts of violence in the institution, Respondent argues that they are less predictive of violence while on release and "arguably resulted entirely from the uniquely difficult circumstances of life as a prison inmate in a mental health unit. He argues that he has "insight" into his mental illness, although he acknowledges that this insight is "far from perfect" and is not evidenced by any reliable "medical compliance." He also recites his age as an ameliorating factor.

In United States v. Ecker, 30 F.3d 966, 970 (8th Cir.), cert. denied, 513 U.S. 1064 (1994), the Court of Appeals for the Eighth Circuit suggested factors which the Court should take into consideration in determining the issue presented in a case such as this one. Those considerations include "a history of dangerousness, a history of drug or alcohol use, identified potential targets, previous use of weapons, any recent incident manifesting dangerousness, and a history of problems taking prescribed medicines." These factors were considered by Dr. Pearlson, as well as by Dr. Scronce. Dr. Pearlson's conclusions are set forth in full in Defendant's Exhibit 15. We set forth below lengthy excerpts from that Report, since they appear to this Court to be inconsistent with the claims of Respondent in its Memorandum. Dr. Pearlson's Report states:

> "Prior to the current incarceration, Mr. Davis had returned to his usual pattern of medication noncompliance and drug use. He became acutely psychotic, believing that his family had been murdered. He was reported to be agitated, depressed and suicidal. Upon transfer to FMC Rochester Mr. Davis continued to display active symptoms of psychosis. He paced in his cell, talked to himself and appeared to be responding to

> internal stimulation. At one point he stopped eating due to his belief that he was being served the cut up body parts of his sister.
>
> * * * *
>
> "Mr. Davis clearly stated that he had no thoughts of harming himself or others. He explained [sic] the two aggressive incidents in which he has been involved over the last few months by stating that others thought he was rich and they wanted things from him. He said that on one occasion he had tried to be nice to another inmate by giving him things. However, when he tried to stop giving that inmate his canteen items, the inmate threatened to assault him sexually. Mr. Davis also said that that inmate 'said something about Jehovah' so Mr. Davis 'slapped him on the cheek.'"
>
> * * * *
>
> "He has been seriously ill within the last six months. During that time he was agitated and irritable. His thoughts and actions were frequently influenced by strong beliefs that others intended to harm him and his family. . . . Due to his long history of inconsistent medication compliance his stability would be better assured with the use of an injected form of antipsychotic medication."
>
> * * * *
>
> "Mr. Davis has demonstrated a pervasive pattern of disregard for and violation of the rights of others as indicated by his failure to conform to social norms with respect to lawful behaviors, deceitfulness, irritability and aggressiveness, consistent irresponsibility, and lack of remorse. Consistent with Antisocial Personality Disorder, this behavior has been present even when Mr. Davis has been psychologically stable."

The evidence establishes that a person who has never engaged in violent behavior in the past is less likely to engage in such conduct in the future, and that the opposite is also true. The fact that Respondent has engaged in violent behavior in the past is an appropriate factor to consider in deciding whether there is a risk that he will do so again. The record contains many examples of Respondent's past violent activity, and these are summarized in the Reports of Dr. Scronce (GX2) and Dr. Pearlson (DX15). The

evidence includes the following.

In May, 1998, Respondent was hospitalized involuntarily because he threatened to kill his sister. When he reported to FCI Victorville, California, in May, 2001, he was suicidal. Most recently, Respondent has been engaged in physical disputes with fellow inmates at FMC Rochester. We do not credit his claim that he was not the aggressor in those disputes, but even if he were not, it is clear that he did not withdraw from the fights. The Presentence Report (GX3) outlines many other occasions on which Respondent engaged in activity which suggests that he is willing to risk his own safety, as well as the safety and property of others.

His counsel notes that the evidence does not conclusively establish that all of the violence in which Respondent engaged in the past was the result of his mental illness. But if Respondent engaged in violence even before he was suffering from a mental disease or defect, then it is even more likely that he will engage in violence now that he is suffering from mental illness.

The fact that Respondent has failed to take medication in the past is another indicator which supports the conclusion that there will be a substantial risk if he is not confined for additional treatment. While it is commendable, as the Respondent notes, that he has caused himself to be admitted for treatment on several occasions, the fact remains that he has failed to complete that treatment. Respondent suggests that his actions in submitting for treatment are examples of his insight into his mental problems. In fact, his failure to participate in the treatment is evidence that he lacks that insight. It is not enough to simply go to a treatment facility from time to time; what is required is persistence to conclusion. Indeed, there are many institutions which simply will not accept Respondent

as a patient by reason of his past conduct. GX6.

Respondent suffers from many delusions, including that the officials at FMC Rochester are attempting to poison him, and that many of his family members have been killed or raped, or chopped up and fed to him. He believes that he is a member of the FBI, CIA, or the Federales, has an interest in guns, and has been convicted of gun related crimes.

The risk that Respondent will engage in violent behavior is also increased by the fact that he has no relatives or friends who will be available to support him. He offers as Exhibits 16 and 17 the letters written by his sister and brother-in-law, but these tend to show only a sort of sympathy for his condition, not an invitation. In fact, his sister notes that she hopes that Respondent will "get in a Halfway house."[7] If now released, there will be neither supervision (and the support that goes with it) nor conditions (and the extra incentive created by the consequences which follow from the failure to abide by conditions). Even when out on supervised release, Respondent did not abide by the conditions of that release. The likelihood now is even higher that Respondent will engage in the activity which was forbidden by the earlier conditions, and that this will result in bodily harm or substantial property damage to others.

## II. RISKS RESULT FROM THE MENTAL DISEASE OR DEFECT

The testimony of Dr. Scronce is unequivocal that the risks of harm are present by reason of the disease or defect, and we do not find real disagreement in the

---

7

She also notes her hope and expectation that Respondent will not "drink or do drugs." As we know from Dr. Pearlson, there is a high probability that this hope will not be realized.

Report or testimony of Dr. Pearlson. Her "Risk Assessment" analysis substantiates that the factors taken into consideration by Dr. Scronce are appropriate factors, and that the consideration of these factors leads to the probability of future harm by reason of Respondent's mental illness:

> "Risk Assessment: A history of past violence repeatedly appears as the strongest correlate in actuarial studies of violence and related phenomena. Use of psychoactive substances, particularly alcohol, clearly correlates with increased violence, as does an active mental illness such as mania. Mr. Davis was convicted of Battery with Serious Bodily Injury in 1988. . . . The balance of his long legal history includes drug-related but not violent offenses. Mr. Davis has a history of suicidal threats and as recently as 1998 was hospitalized involuntarily due to voices that told him to step in from [sic] of a bus. He also hospitalized involuntarily in 1998 after making threats to kill his sister. While incarcerated, Mr. Davis has been confined to the Special Housing Unit twice after aggressive incidents. These incidents were not described as major assaults, but rather as 'scuffles.' Mr. Davis cooperated with custody staff immediately after the incidents. No significant injuries were reported."

Dr. Pearlson suggests that the fact that Respondent is growing older (he is 55 years old) will "mitigate" his potential for violent behavior. She states: "Violence peaks in the teenage years, declines slowly through the thirties, then drops precipitously after age forty." Dr. Scronce challenged this point of view, but even if it were accepted as applying to the population generally, the record shows that it does not apply to Respondent. If anything, his violent behavior has increased as he has grown older. An explanation for this increasing violence in Respondent, as contrasted with a decrease in violent behavior as one ages, is the fact that Respondent suffers from a major mental illness. In any event, the record does not support the view that he presents a decreased risk by reason of his age.

Dr. Pearlson next states that Respondent "plans to rejoin his partner and his daughter, whom he finds supportive." The evidence shows that this option is not available to Respondent.

Dr. Pearlson states that he "has agreed to take injected antipsychotic medication, which would significantly reduce the likelihood of a serious exacerbation of his mental illness." What this really means, of course, is that there is a likelihood of a serious exacerbation of his mental illness, and if he does not take antipsychotic medication, that likelihood will not even be reduced. According to the testimony, this medication is not available in injection form, and even if it were, there are no mechanisms available to require that Respondent agree to submit to the injections, and the record shows that he will not even comply with less intrusive medication.

## III. NO SUITABLE STATE PLACEMENT

The Court must make a determination as to whether there is a suitable state facility which could provide safe treatment for Respondent, having in mind the Congressional view that such treatment is the first responsibility of states. See Chairse, 18 F. Supp.2d at 1032-33. The testimony of Emily J. Young substantiates the substantial, but ultimately unsuccessful efforts of the Petitioner to find a suitable state facility which would accept Respondent. The effort was complicated by the fact that many institutions are familiar with Respondent, and will not accept him based upon their experience. Others simply are unable to do so. See GX6. The effort is further complicated, Ms. Young explained, by the existence of a California law which purports to forbid a state institution from accepting a patient for treatment directly from a federal hospital. The record amply demonstrates that "suitable arrangements for State custody and care of [Respondent] are

not available." 18 U.S.C. § 4246(a). FMC Rochester is a suitable facility for the care and treatment of Respondent.

## RECOMMENDATION

For the reasons set forth above, it is recommended that the Petition be granted, and that the District Court commit Respondent to the custody of the Attorney General to hospitalize him for treatment in a suitable facility.

Dated: March 12, 2002

JOHN M. MASON
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before March 27, 2002 a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before March 27, 2002.