**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**United States of America,** **Civil No. 01-1786 DSD/SRN**

**Petitioner,** **<u>REPORT AND RECOMMENDATION</u>**

**v.**

**John Leonard Davis**

**Respondent.**

---

Perry F. Sekus, Assistant United States Attorney, on behalf of Plaintiff

Katherine M. Menendez, Assistant Federal Public Defender, on behalf of Defendant

---

The above-entitled matter came before the undersigned United States Magistrate Judge on January 28, 2005 pursuant to 18 U.S.C. § 4246 (2000) on Petitioner's Motion for an Order to Modify or Revoke Conditional Release (Doc. No. 26) and Respondent's request for unconditional release. This matter has been referred to the undersigned for resolution pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

## I. BACKGROUND

Respondent John Leonard Davis (Davis) served time in federal custody in 1999-2001 for a drug-related offense. (Doc. No. 12 at 1-2.) Prior to his release, he was committed to federal custody for treatment of a mental illness. (Doc. No. 18.) He was later conditionally released. (Doc. No. 21.) The United States now petitions the Court to revoke Davis's conditional discharge from the custody of the Bureau of Prisons (BOP) pursuant to 18 U.S.C. 4246(f). (Doc. No. 26.) The United States claims that Davis violated the conditions of his release and should be remanded to the custody of the

BOP. (Id.) Davis opposes the petition and seeks to be released without any conditions. (Doc. No. 35 at 1-2.)

**A. Respondent's Background and Criminal History Prior to His Federal Drug Arrest**

Davis is a fifty-eight year old man. (See Doc. No. 15 Ex. 3 at 1.) He attended high school in Santa Cruz, California. (Gov't Ex. 9 at 2.) Davis reports that he was expelled or suspended from high school six or seven times for fighting. (Id.) Davis dropped out of high school, joined the Marine Corps, and served in Vietnam from 1963 to 1965. (Id.) Davis represents that he was discharged from the military after he "flipped out" in Vietnam and, thereafter, experienced hallucinations and delusions. (Id.) Following his military service, Davis claims to have been married twice and fathered five children with two women, the most recent of which was born while Davis was out on conditional release in 2003-2004. (Id. at 1-2.)

Davis has tried to kill himself. In 1998, he tried to kill himself by jumping from the Oakland Bay Bridge. (Id.) He has also been admitted to a Veterans Administration hospital after reporting that auditory hallucinations were telling him to step in front of a bus. (Id.) He has been hospitalized on other occasions for suicidal ideation. (Id.)

Over the course of his life, Davis has been arrested about two dozen times and has plead guilty to or been convicted of crimes in about a dozen of these arrests. (Doc. No. 23 Ex. B.) In connection with these arrests, Davis has used fourteen aliases, two social security numbers, and two dates of birth. (Id.) Some of Davis's past crimes and other actions involve injury to others. (Id.) For example, in 1969, Davis was convicted of furnishing dangerous drugs to a minor after he invited a fifteen year old

girl to his hotel room and gave her injections of drugs. (Id. at 4.) Initially, the girl indicated that Davis attempted to have sexual intercourse with her after he injected her with drugs. (Id.) At his trial, however, the girl denied that she was forced to have sexual intercourse. (Id.) In 1971, Davis was convicted of robbery and impersonating a peace officer and he pled guilty to being a felon in possession of a firearm. (Id.) In 1987, Davis was convicted of burglary in the first degree and battery with serious bodily injury when he broke into his girlfriend's apartment and struck her. (Doc. No. 14 Ex. 11 at 6-7.) Davis's girlfriend told police that Davis struck her in the face and head and slammed her head into a cement floor. (Id.) She also initially stated that Davis spread her legs and "jammed his hand into her vagina" repeatedly. (Id. at 7.) The victim later reported that she did not wish to file any sexual assault charges. (Id.) In 1995, Davis was arrested for resisting arrest and criminal mischief for pressing a knife into a person's ribs and threatening to cut him. (Doc. No. 15 Ex. 2 at 2.) When police arrived, Davis resisted attempts to handcuff him. (Id.) In 1998, Davis threatened to kill his sister. (Gov't Ex. 9 at 3.) In 1999, while being housed at FMC-Rochester (Gov't Ex. 10) he threatened to kill physicians at FMC-Rochester, although more information about these threats is unavailable.

**B. Respondent's Arrest and Commitment Pursuant to 18 U.S.C. § 4246(d)**

On April 9, 1999, Davis was convicted of importation of marijuana and possession of marijuana with intent to distribute for driving a car loaded with seventy-nine pounds of marijuana from Mexico into the United States. (Doc. No. 15 Ex. 3.) He was sentenced to twenty-one months imprisonment. (Doc. No. 12 at 1-2.) On May 8, 2000, Davis was conditionally released from prison. (Id. at 2.) He violated his release conditions by abusing alcohol and cocaine, discontinuing prescribed medications, and for failing to report in with his supervising probation officer. (Id.) As a result, he was

sentenced to prison for another seven months, ending October 2, 2001. (Id.) Prior to his release, he was transferred to the Federal Medical Center in Rochester, Minnesota (FMC-Rochester) for psychiatric treatment. (Id.) While there, Davis acknowledged he had auditory hallucinations and was occasionally housed in the Special Housing Unit (SHU) for getting into fights and arguments. (Id.) Days before his scheduled release, a petition was filed by officials at FMC-Rochester requesting that Davis be committed pursuant to 18 U.S.C. § 4246(d), a statute that authorizes the hospitalization of a person due for release but suffering from a mental disease or defect that poses a danger to society. (Id.)

In January 2002, a hearing was conducted to determine whether Davis was "suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another." § 4246(d). (Id.) The court found that there was no dispute that Davis suffered from Schizo-Affective Disorder of the Bipolar type, Polysubstance Dependence and Antisocial Personality Disorder and that, if released, it was highly probable that he would not take his medication, would abuse substances, and would engage in illegal behavior. (Id.) Davis presented the testimony of Dr. Susan Pearlson who testified that the evidence was not sufficient to justify commitment under § 4246(d) because "there [was] not clear and convincing evidence that" Davis created "a substantial risk of bodily injury to another person." (Id. at 8.) Her conclusion was based in part upon her finding that Davis's past violent behavior was mitigated by his age: "Violence peaks in the teenage years, declines slowly through the thirties, then drops precipitously after age forty." (Doc. No. 14 Ex. 15 at 8.) The court discounted this testimony because Dr. Pearlson did not provide a basis for her conclusion. (Doc. No. 12 at 8.) The court found that Davis had been

involuntarily hospitalized in May 1998 for threatening to kill his sister, that he had engaged in physical disputes with fellow inmates while at FMC-Rochester in 2001, that he believed he was a member of the FBI, CIA, or Mexican Federales, and that he had an interest in guns and had been convicted of gun related crimes in the past. (Id. at 11-12.) On April 18, 2002, based upon the above findings, the Honorable District Court Judge David S. Doty ordered that Davis be committed to the custody of the Attorney General for further hospitalization and treatment pursuant to 18 U.S.C. § 4246(d). (Doc. No. 18.)

### C. Respondent's First Conditional Release Pursuant to 18 U.S.C. § 4246(e) and Subsequent Revocation

Following further treatment, the United States petitioned the district court to conditionally release Davis pursuant to 18 U.S.C. § 4246(e). (Doc. No. 20). On May 16, 2002, Judge Doty ordered Davis's conditional discharge to a treatment facility in California subject to twenty conditions. (Doc. No. 21.) Just months after his release, Davis violated the conditions of his discharge by leaving the judicial district where he was released and changing his address without permission of his probation officer and for failing to comply with his court-ordered treatment regimen (including failing to take medications for delusions, agitation, and depression). (Doc. No. 23.) The government petitioned for revocation of the release pursuant to 18 U.S.C. § 4246(f), Davis was arrested, his conditionally release revoked, and he was returned to the custody of the Bureau of Prisons. (Doc. Nos. 22-23.)

### D. Respondent's Second Conditional Release Pursuant to 18 U.S.C. § 4246(e) and the United States' Present Petition for Revocation

Following additional treatment, the United States again petitioned for Davis's conditional release under § 4246(e). On June 6, 2003, Judge Doty again conditionally released Davis to a

treatment facility in California, this time imposing only seven conditions.[1] (Doc. No. 25.) In September 2003, the United States alleges that Davis violated the conditions of his release by leaving the judicial district and changing his residence without permission of his probation officer. (Doc. No. 26, also referenced as Gov't Ex. 7.)[2] In response, in April 2004, the United States again requested revocation of Davis's conditional release pursuant to 18 U.S.C. § 4246(f). (Id.) In June 2004, Davis was arrested in Redding, California (Doc. No. 27). He arrived at FMC-Rochester in August 2004. (Gov't Ex. 8.)

---

[1] Only four of these conditions direct Davis to do something. He was ordered to: (1) enter outpatient mental health treatment and establish residence at a structured facility such as Carroll's Community Care or Mercy Guest House in San Diego, California, upon immediate notification that a bed is available; (2) comply with whatever treatment regimen the treating clinicians at the outpatient mental recommend; (3) should his psychiatric condition deteriorate, comply with admission and psychiatric inpatient treatment at the San Diego Veterans Affairs Medical Center (VAMC); and (4) continue to take medication as ordered or as may be adjusted by the treating clinicians at the outpatient facility at the VAMC. (Doc. No. 25.) The other three conditions are directions to the United States Probation Office and Davis's medical providers. (See id.)

[2] While not addressed by either petitioner or respondent, Judge Doty's June 2003 Order setting the conditions of Davis's release did not expressly condition Davis's release upon seeking the permission of his probation officer to leave the judicial district or to change his residence. (See Doc. No. 25.) The United States' revocation petition appears to reference the conditions (number six and eleven) of Judge Doty's May 2002 Order setting the conditions of Davis's earlier release. (See Doc. No. 26.) Judge Doty's May 2002 Order was superceded by the one issued in June 2003. The United States' April 2004 revocation petition, however, does allege that Davis left the treatment facility he had been assigned to as part of his treatment regimen. (Id.) These facts sufficiently allege a violation of the second condition of Judge Doty's June 2003 Order despite the lack of express reference thereto. (See Doc. No. 25.) The Court finds that, despite the significant errors contained therein, the revocation petition cannot be denied for failing to identify a violation of an existing condition. Thus, the Court reviews the merits of the revocation petition below.

### 1. August 2004, October 2004, and January 2005 Risk Assessments

Thereafter, three risk assessment reports were prepared to aid the Court in making its revocation decision, one in August 2004, one in October 2004, and one in January 2005. (Gov't Exs. 10, 11, and 12.) The August 2004 risk assessment, signed by Doctors John McKenzie, Andrew Simcox, and James Hayden found that "[t]here have been no recent instances of convictions for violent offenses" but that Davis "believes he is a law enforcement official" and that "it appears possible that he will feel entitled to possess a weapon in the future." (Gov't Ex.10 at 4-5.) The panel indicated that "Davis appears to have engaged in fewer instances of aggression during the past decade. This decline could be due to aging, and/or his placement in structured or supervised settings." (Id. at 5.) The panel concluded that "Davis's release will create a risk to others due to his mental disease or defect." (Id. at 5.)

The October 2004 risk assessment panel, consisting of Doctors Simcox, Amy Hamilton, and Daniel Shine, noted that Davis "stated he had no plans to carry a weapon in the future and had not carried a gun in the past 20 years." (Gov't Ex. 11 at 2.) The panel opined that "[m]ental health professionals have limited ability to predict future violent acts" but consider three factors key in making such predictions: (1) the history of aggressive behaviors; (2) the relationship between past violence and mental illness symptoms; and (3) the patient's present mental status. (Id.) The panel concluded that Davis's mental health had improved substantially in the past month and that he was an appropriate candidate for conditional release at a suitable facility. (Id.) At the time, however, no suitable facility was available to which Davis could be released. (Id.)

The January 2005 risk assessment panel consisted of Doctors Simcox and Shine. (Gov't Ex.

12 at 3.) This panel found that Davis's conditioned had worsened, with Davis believing that he was in contact with the Santa Cruz, California Sheriff's Office via telepathy. (Id. at 2.) Davis also indicated that he was the angel Gabriel, he was 175.6 trillion years old, and his mission on Earth was to "checkmate Satan." (Id.) Based upon their findings, the panel urged that Davis's conditional release be postponed until there was "substantial improvement in Davis's mental health." (Id.)

**2. Hearing Pursuant to 18 U.S.C. § 4246**

On January 28, 2005, this Court held a hearing at FMC-Rochester, consistent with the provisions of 18 U.S.C. § 4247(d), in which Davis was present and was afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appeared at the hearing. The United States offered evidence at the hearing, including the testimony of Dr. Shine, a staff psychiatrist at FMC-Rochester, who had participated in Davis's treatment regimen while Davis was at FMC-Rochester. Dr. Shine testified as to the contents of the risk assessment reports prepared as of the date of the hearing. On cross-examination, Dr. Shine stated that he had no hard information that anyone had been harmed or any property damaged by Davis during Davis's disappearance between September 2003 and June 2004 while on conditional release and before his arrest for violating the conditions of his release. Dr. Shine also testified on cross-examination that Davis had been housed in the open wing of FMC-Rochester since August 2004 without incident of fights with other inmates. Dr. Shine further testified that Davis had freely accepted medical treatment and participated in his prescribed treatment regimen since August 2004 and had not exhibited suicidal ideation or disruptive behavior. He also testified that there was no way to tell if Davis had acted on his

delusions of being a law enforcement officer, with the possible exception of his 1971 conviction.[3] Among other evidence, the United States offered into evidence the August 2004, October 2004, and January 2005 risk assessments (Gov't Exs. 10-12). Davis submitted as evidence fifteen certificates that FMC-Rochester had presented to him between July 2002 and December 2004. (Def.'s Ex. 1.) These certificates are for achievement and participation in the areas of medication management, social skills, substance abuse treatment, dental hygiene, community re-entry, guitar and choir, conversation skills, long distance parenting, and psychology process classes offered at FMC-Rochester. (Id.)

**3. Post-Hearing Briefing and February 2005 Risk Assessment**

Following the hearing, the Court granted both parties the opportunity to submit additional briefs. (See Doc. No. 32.) Along with its post-hearing brief, the United States submitted a fourth risk assessment, dated February 16, 2005. (Doc. No. 33 Ex. A.) The fourth risk assessment panel, consisting of Doctors Simcox, Shine, and Hamilton, reported that Davis's medication had been modified (increased and administered in a liquid, rather than a solid, form) and marked improvements had been realized in the three weeks since the January 2005 risk assessment. (Id. at 1-2.) For example, Davis denied believing he was the angel Gabriel and that he could communicate telepathically with others. (Id. at 1.) Davis also admitted that he suffers from mental illness and chemical dependency problems. (Id.) He said that he could not foresee any time or circumstances under which he would be permitted to carry firearms in the future. (Id. at 2.) He acknowledged that using illegal drugs or alcohol would likely interfere with his treatment and indicated that he did not intend to use such

---

[3] Although Davis was convicted of impersonating a peace officer in 1971, there is no conclusive evidence that Davis was suffering from his present mental illness in 1971.

substances. (Id.)

The report indicates that placement at the Empire Recovery Center in Redding, California would likely be feasible within the next month. (Id. at 1) The fourth risk assessment panel recommends that Davis be conditionally released to the Empire Recovery Center when placement becomes available to "control the risk he may pose to others in the community." (Id. at 2.) Under the BOP plan, Davis would reside at Empire Recovery Center for up to ninety days followed by a six-month outpatient program. (Doc. No. 33 Ex. B at 2.) The February 2005 risk assessment concludes by requesting that "the Court order the conditional release to become effective when placement becomes available at the Empire Recovery Center and appropriate transportation can be arranged." (Doc. No. 33 Ex. A at 2.)

## II. DISCUSSION

### A. Legal Standard

#### 1. Standard for Revocation Under 18 U.S.C. § 4246(f)

Where a person is released conditioned upon adherence to a mandatory treatment regimen under 18 U.S.C. § 4246(e), the director of the facility responsible for administering the treatment regimen is required to notify "the court having jurisdiction over the person of any failure of the person to comply with the regimen." 18 U.S.C. § 4246(f). When the person is thereafter arrested:

> The court shall, after a hearing, determine whether the person should be remanded to a suitable facility on the ground that, in light of his failure to comply with the prescribed regimen of medical, psychiatric, or psychological care or treatment, his continued release would create a substantial risk of bodily injury to another person or serious damage to property of another.

Id. "In deciding this question under 18 U.S.C. § 4246(f), the Court may take into consideration the fact that it has already been determined by clear and convincing evidence that Respondent is mentally ill

and dangerous, and in need of treatment [pursuant to section 4246(d).]" United States v. Woods, 970 F. Supp. 711, 717 (D. Minn. 1997). Because section 4246(f) does not provide for a higher evidentiary standard—unlike the clear and convincing standard applied in an original commitment under section 4246(d)—to prove revocation of a conditional discharge, the United States need only show by a preponderance of the evidence that the respondent: (1) violated the conditions of the release; and (2) that his continued failure to comply with the prescribed treatment regimen would create a substantial risk of bodily injury to another person or serious damage to property of another. Woods, 970 F. Supp. at 717-18.

### 2. Standard for Modification or Elimination of Conditions of Release or Discharge Under 18 U.S.C. § 4246(e)

A court also has the statutory power to "at any time . . . after a hearing . . . modify or eliminate the regimen of medical, psychiatric, or psychological care or treatment" if "the court finds by a preponderance of the evidence that the person has recovered from his mental disease or defect to such an extent that . . . his release" without conditions "would no longer create a substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C. § 4246(e). Further, "counsel for" a person committed under section 4246 "may, at any time during such person's hospitalization, file with the court that ordered the commitment a motion for a hearing to determine whether the person should be discharged from such facility" provided that "a copy of the motion shall be sent to the director of the facility in which the person is hospitalized and to the attorney for the Government." 18 U.S.C. § 4247(h).

### 3. Standard for "Substantial Risk"

"Overt acts of violence are not required to prove dangerousness." United States v. LeClair, 338 F.3d 882, 885 (8th Cir. 2003), cert. denied, 540 U.S. 1025 (2003) (citing United States v. Steil, 916 F.2d 485, 487-88 (8th Cir.1990)); Cf. United States v. Ecker, 30 F.3d 966, 970 (8th Cir.1994), cert. denied, 513 U.S. 1064 (1994) (holding where last assault occurred ten years ago and no assault in three years of confinement did not require a conclusion of not dangerous).

> A finding that a defendant poses a substantial risk under section 4246 may be based on any activity that shows a genuine possibility of future harm to persons or property. Due process does not require a finding that [the respondent] recently committed dangerous acts. Instead, the recency of dangerous activity is merely a factor for the district court to consider when weighing the evidence.

United States v. Dixon, 963 F.2d 377, 1992 WL 104270, at *1 (8th Cir. 1992) (per curiam). "[M]ajor factors in determining potential dangerousness include: a history of dangerousness, a history of drug or alcohol use, identified potential targets, previous use of weapons, any recent incidents manifesting dangerousness, and a history of problems taking prescribed medicines." Ecker, 30 F.3d at 970. In United States v. Chairse, the Honorable Judge Richard H. Kyle of this district catalogued six decisions in which courts evaluated the "substantial risk of bodily injury to another person" using the section 4246(d) clear and convincing evidence standard. 18 F. Supp. 2d 1021, 1028-29 (D. Minn. 1998). Judge Kyle found that respondents had been found to be dangerous in cases where:

> (1) the respondent repeatedly assaulted others, destroyed property, experienced violent auditory and visual hallucinations, and wrote letters admitting his violent nature and threatening to commit future crimes; (2) the respondent assaulted a psychiatrist, damaged at least three cells, and verbally and physically threatened others; (3) the respondent had a history of actual violent conduct involving a serious assault and a conviction for arson, and he also wrote disturbing and threatening letters; (4) the respondent had committed a violent act in the past, believed that his mother was the devil who was trying to make him

> commit evil acts, had no sense for the value of life, and had a preoccupation with suicide; (5) the respondent had a "long history of psychiatric illness and assaultive and aggressive behavior," with delusional and aggressive visual and auditory hallucinations; or (6) [the respondent had] no history of violent behavior and the only conviction was for possession of (sic) sawed-off shotgun, but the respondent wrote numerous threatening letters, he responded to hallucinations as if they are real, five mental health workers opined that he was dangerous, and no other contrary evidence was presented showing that he was not dangerous.

Id. (citations omitted). Presumably, less evidence is needed to establish that a person is a substantial risk to others upon application of the less demanding, preponderance of the evidence standard in a section 4246(f) revocation proceeding.

**B. Parties' Positions**

The United States requests that the Court grant its revocation petition brought under 18 U.S.C. § 4246(f), deny Davis's request pursuant to section 4246(e) to be unconditionally released, and enter a new conditional discharge order that specifies a treatment regimen at the Empire Recovery Center in Redding, California. (Doc. No. 33 at 2.) The United States alleges, and Davis does not dispute, that Davis violated the conditions of his release. (Gov't Ex. 5.) Therefore, the United States argues that the only issue for the Court is whether Davis presents a danger if released. (Doc. No. 33 at 5.) The United States contends, and Davis concedes, that it need only show this danger by a preponderance of the evidence. (Id.)

Davis argues that the February 2005 risk assessment supports his contention that he "expresses an understanding that he cannot possess weapons, a desire to stay sober, a willingness to continue treatment, and insight into his illness." (Doc. No. 36.) Davis argues further that "even though he is plainly still mentally ill and will remain so for the rest of his life, he is no longer any sort of danger to

others and ought to be released" without conditions. (Id.) Davis contends that the Court's power is not limited to ruling merely on the section 4246(f) revocation petition, but that sections 4246(e) and 4247(h), and even the Woods case, "make clear that the Court can . . . reopen the question of the propriety of continued commitment." (Doc. No. 35.) At the motion hearing, Davis requested that the Court consider the conclusion of Dr. Pearlson at Davis's January 2002 section 4246(d) hearing that Davis was not a substantial risk to others as evidence in support of his request for unconditional release.

### C. Court's Recommendation

Based upon the findings herein, the Court recommends that the United States' Motion for an Order to Modify or Revoke Conditional Release (Doc. No. 26) be denied as moot. Pursuant to 18 U.S.C. § 4246(e), the Court further recommends conditionally releasing respondent consistent with the recommendations contained in the February 16, 2005 risk assessment report prepared by FMC-Rochester.

#### 1. Revocation of Conditional Discharge Pursuant to 18 U.S.C. § 4246(f)

Davis does not contest the United States' assertion that he violated the conditions of his most recent conditional discharge. Therefore the Court's revocation decision rests on whether the United States has shown by a preponderance of the evidence that "in light of his failure to comply with the conditions of his release," Davis's "continued release would create a substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C. § 4246(f). Since the United States filed its revocation petition (Doc. No. 26), Davis was arrested, transported to FMC-Rochester, and has been evaluated a number of times, resulting in four risk assessment reports. The latest of these risk assessment reports recommends that Davis be conditionally released. (Doc. No. 33 Ex. A.) The

February 2005 risk assessment panel's recommendation of "conditional release" moots the United States' revocation petition. Thus, the Court recommends denying as moot the United States' Motion for an Order to Modify or Revoke Conditional Release (Doc. No. 26).[4] If the government's revocation petition is denied, then Davis remains conditionally released under the terms set forth in Judge Doty's June 2003 release order (See Doc. No. 25).

**2. Release of Respondent Pursuant to 18 U.S.C. § 4246(e)**

**a. Procedural Posture of the Court's Review**

Also before the Court is the request of Davis's counsel asking the Court to treat her request to release Davis without conditions as a motion pursuant to 18 U.S.C. § 4247(h) or an opportunity, sua sponte, for this Court to invoke its authority under 18 U.S.C. § 4246(e) (Doc. No. 35) and the request of the United States to again conditionally release Davis (Doc. No. 33). There are three ways to construe the requests before the Court. First, the Court could construe the February 2005 risk assessment panel's recommendation that Davis be conditionally released as a petition by the United States pursuant to 18 U.S.C. § 4246(e) for conditional release or modification of the existing conditional release of Davis. The statute's technical requirement, however, that the petition be filed by the director of FMC-Rochester has not been met. Second, the Court could, sua sponte, pursuant to

---

[4] Had the February 2005 risk assessment report not rendered the revocation petition moot, the Court still would have recommended denial of the petition. The Court finds that the United States did not meet its burden to show by a preponderance of the evidence that revocation of respondent's conditional release was warranted. But such a finding does not mean that Davis should be unconditionally released. As shown below, Davis bears the burden to show by a preponderance of the evidence that he has recovered from his mental illness to such an extent that he would no longer pose a danger to society if released without any conditions.

the last paragraph of 18 U.S.C. § 4246(e), consider whether Davis's current conditional release conditions should be modified to reflect the release conditions recommended by the February 2005 risk assessment panel. See United States v. McAllister, 225 F.3d 982, 990 (8th Cir. 2000) ("The last paragraph of 18 U.S.C. § 4246(e) allows a district court to modify the regimen of care imposed upon an individual who has been conditionally released.") The January 28, 2005 hearing before this Court was, as required by 18 U.S.C. § 4246(e), conducted in accord with 18 U.S.C. § 4247(d), so the procedural statutory requirements have been met. Third, the Court could construe Davis's request for his unconditional discharge as a motion brought under 18 U.S.C. § 4247(h) and adjudged by the standard set forth in 18 U.S.C. § 4246(e). See e.g., United States v. Anderson, 104 F.3d 359, 1996 WL 733141, at * 3 (4th Cir. 1996) (per curiam), cert. denied, 520 U.S. 1109 (1997) (reviewing a section 4247(h) motion using the standard set forth in section 4246(e)). The United States has been on notice from the very beginning of the proceedings on this motion that Davis wished to be unconditionally released so no prejudice would result from considering the request for unconditional release as one brought under section 4247(h).

In the present case, however, which procedural avenue this Court chooses to undertake is largely an academic exercise. In any of the above scenarios, to the extent that Davis seeks to be unconditionally discharged, the onus of proof is on Davis to establish by a preponderance of the evidence that he "has recovered from his mental disease or defect to such an extent that his release would no longer create a substantial risk of bodily injury to another person or serious damage to property of another." See e.g., United States v. Anderson, 151 F.3d 1030, 1998 WL 372382, at * 2 (4th Cir. 1998) (per curiam) (noting that the government does not bear the burden of proof in an 18

U.S.C. § 4246(e) hearing but that the plain meaning of the text requires that the person seeking release prove he has recovered to the required extent.) The Court will construe counsel's request for the unconditional release of her client as a motion under 18 U.S.C. § 4247(h) but, for the record, had this request not been made, the Court would have, sua sponte, considered modifying or eliminating Davis's treatment regimen under the last paragraph of 18 U.S.C. § 4246(e) using the same evidentiary standard.

**b. Substantive Review of Respondent's 18 U.S.C. § 4247(h) Motion**

Setting aside the unproven sexual assault accusations levied against Davis in 1969 and 1987, there remains evidence that Davis has harmed or threatened to harm others in the past. Thirty-six years ago he furnished drugs to a minor. (See Part I.A., supra.) Thirty-four years ago he possessed a firearm in connection with impersonating a peace officer and committing a robbery. (Id.) Eighteen years ago he broke into an acquaintance's residence and battered her. (Id.) Ten years ago Davis threatened to cut a person by pressing a knife into a person's ribs and resisted arrest when approached by police. (Id.) Seven years ago he threatened to kill his sister. (Id.) Six years ago he threatened to kill physicians at FMC-Rochester. (Id.) Four years ago, Davis was involved in a fight with another inmate at FMC-Rochester. (See Part I.B., supra.) There does not appear to be any additional evidence of violence in more recent years.

In September 2003, Davis disappeared from the treatment facility in California in violation of his conditional release. (See Part I.D., supra.) He reappeared nine months later and was arrested for violating the conditions of his release. (Id.) His arrest was not precipitated by acts of violence against others but for failing to follow the technical conditions of his treatment regimen. (Id.) The United States

has presented no evidence that Davis harmed anyone during the nine months he was not under supervision by the United States Probation Office. Since his arrival at FMC-Rochester in August 2004, Davis has not been in any fights and has participated willingly in his treatment regimen. He has been housed in the open wing of FMC-Rochester, the lowest security wing available at that facility. (See Part I.D.2., supra.)

The four risk assessments performed from August 2004 through February 2005, show that respondent's ability to recognize his delusional behavior may vary over time. The assessments suggest that Davis's insight into his condition improved from "limited" in August 2004 to "some insight" in October 2004 and then worsened by January 2005, but three weeks later, after an increase in medication and switch from a solid to a liquid form, Davis's condition "substantially improved" and the "improved remission of symptoms" was such that the February 2005 risk assessment panel concluded that conditional release was appropriate.

Other than attacking the validity of the conclusions of the four risk assessment panels that he either should not be released or only be released with conditions, Davis presents little evidence in support of his argument that he has recovered from his mental disease to such a degree that he no longer poses a danger to society if released without conditions. He asks the Court to consider the certificates of achievement he received while housed at FMC-Rochester. He also asks the Court to consider the findings of Dr. Pearlson who testified on behalf of Davis at Davis's section 4246(d) hearing in January 2002 and found that Davis did not pose a danger to society. (See Part I.B., supra.) The Court finds that Davis's many certificates of achievement do show that his condition has improved in the last several years. As the four risk assessment reports filed between August 2004 and February

2005 show, however, Davis's condition is highly variable over time. For instance, all of these certificates were awarded before Davis's January 2005 risk assessment in which he told FMC-Rochester staff that he was the angel Gabriel, had lived for 175 trillion years, had the mission of checkmating Satan on Earth, and could communicate telepathically with law enforcement officials. (Gov't Ex. 12.) Moreover, despite attending classes and participating actively in his treatment program at FMC-Rochester, Davis has an undisputed recent and miserable track record for staying away from drugs and following his prescribed treatment regimen after he leaves FMC-Rochester. Recent examples include the circumstances surrounding his 2000, 2002, and 2003 conditional release violations.

Additionally, Dr. Pearlson's contrary opinion must be discounted for the following reasons. First, Dr. Pearlson opined that there was not "clear and convincing evidence" that Davis was dangerous to society. The standard of proof applied at the hearing for which Dr. Pearlson prepared her report is very different from that before the Court today. In the section 4246(d) proceeding for which Dr. Pearlson proffered her opinion, the United States had to prove by clear and convincing evidence that Davis was dangerous to society. In the present posture, Davis must prove by a preponderance of the evidence that he has recovered to such an extent that he would not pose a danger to society in the absence of conditions on his release. Second, Dr. Pearlson's opinion was found by a contemporaneous court decision to be conclusory and without support in the record. (See Part I.B., supra.) Third, as noted, Davis's condition varies dramatically over even short time periods. Even if Dr. Pearlson's opinion may have had validity in early 2002, the Court is not willing to assume that Dr. Pearlson would supply the same opinion three years later. Given the above analysis, the Court

discounts greatly Dr. Pearlson's past opinion that Davis's unconditional release did not pose a substantial risk to society.

Based upon the whole of the evidence before it, the Court finds that Davis has not established by a preponderance of the evidence that he has recovered to such an extent that his unconditional release would no longer create a substantial risk of bodily injury to another person or serious damage to property of another. Therefore, the Court recommends that Davis's request for unconditional release be denied. Instead, the Court recommends that Davis be conditionally released as recommended by FMC-Rochester staff in the February 2005 risk assessment.

Based upon the foregoing, and all the files, records and proceedings herein that are appropriately considered on this motion,

**IT IS HEREBY RECOMMENDED that:**

1. Petitioner United States' Motion for an Order to Modify or Revoke Conditional Release (Doc. No. 26) be **DENIED as moot**;
2. Respondent John Leonard Davis's request for unconditional release be **DENIED**; and
3. Respondent John Leonard Davis be ordered released from the custody of the Bureau of Prisons under the following, and only the following, conditions:
    a. That he enter the Empire Recovery Center in Redding, California or other such suitable mental health treatment facility for inpatient and/or outpatient care when such placement becomes available as determined

by FMC-Rochester staff;

b. That he comply with whatever treatment regimen the treating clinicians at the mental health facility recommend;

c. That, should his psychiatric condition deteriorate, he comply with admission and psychiatric inpatient treatment to the Northern California Health Care System in Sacramento, California, the facility that serves all Veterans's Administration clients in that region of California.

d. That he continue to take medication as ordered or as may be adjusted by the treating clinicians at the Empire Recovery Center in Redding, California, Veteran's Administration Clinic in Redding, California, the Northern California Health Care System in Sacramento, California, or other mental health facility selected by FMC-Rochester staff.

e. That he be supervised by the United States Probation Office for a period not to exceed 1 year, pursuant to 18 U.S.C. § 3603(8)(A), to ensure his compliance.

f. That the medical provider may, at any time, recommend modification or elimination of the regimen of medical, psychiatric, or psychological care or treatment, upon certification to the court that to do so would not create a substantial risk of bodily injury to another person or serious damage to the property of another. Any party requesting modification or termination of the conditions of release shall submit documentation

supporting the request through the supervising United States Probation Officer, to the Civil Division of the United States Attorney's Office for the District of Minnesota for a determination as to whether a motion for release should be filed.

DATED: March 3, 2005

s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.1(c)(2) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by March 18, 2005 a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.